SHEILA VAN DUYNE ROMERO (NV State Bar No. 9899)
   sromero@wrslawyers.com
SIMON ARON (CA State Bar No. 108183)
   saron@wrslawyers.com
SUSAN K. SEFLIN (CA State Bar No. 213865)
   sseflin@wrslawyers.com
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
5594-B Longley Lane
Reno, Nevada 89511
Telephone:    (775) 853-6787
Facsimile:    (775) 853-6774

Special Litigation Counsel for Chapter 11
Debtors

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| In re<br><br>ALFRED J.R. VILLALOBOS, an individual,,<br><br>☐ Affects this Debtor<br>■ Affects all Debtors<br>☐ Affects Arvco Capital Research, LLC<br>☐ Affects Arvco Financial Ventures, LLC<br>☐ Affects Arvco Art, Inc.<br><br><br><br>Debtors.<br>_____<br><br>ALFRED J. R. VILLALOBOS, ARVCO CAPITAL RESEARCH, LLC, ARVCO FINANCIAL VENTURES, LLC, and ARVCO ART, INC.,<br><br>Plaintiffs,<br>vs.<br><br>APOLLO MANAGEMENT, L.P., APOLLO MANAGEMENT VII, L.P., APOLLO INVESTMENT FUND VII, L.P., APOLLO OVERSEAS PARTNERS (DELAWARE 892) VII, L.P., APOLLO OVERSEAS PARTNERS (DELAWARE) VII, L.P., APOLLO OVERSEAS PARTNERS VII, L.P. APOLLO CREDIT OPPORTUNITY MANAGEMENT LLC, APOLLO CREDIT OPPORTUNITY FUND I, L.P. , and Does 1-20,<br><br>Defendants.<br>_____ | Case No. 3:10-bk-52248-gwz<br>(Chapter 11)<br><br>Jointly Administered with:<br>10-52249  Arvco Capital Research, LLC<br>10-52251  Arvco Financial Ventures, LLC<br>10-52252  Arvco Art, Inc.<br><br>Adv No. 3:13-ap-_____-gwz<br><br>**COMPLAINT FOR:**<br><br>1.    **TURNOVER OF PROPERTY OF THE ESTATE;**<br>2.    **OBJECTION/DENIAL OF  CLAIMS;**<br>3.    **BREACH OF ORAL CONTRACT;**<br>4.    **BREACH OF WRITTEN CONTRACT;**<br>5.    **INTERFERENCE WITH CONTRACT;**<br>6.    **QUANTUM MERUIT;**<br>7.    **EQUITABLE INDEMNIFICATION;**<br>8.    **CONTRACTUAL INDEMNIFICATION; AND**<br>9.    **AN ACCOUNTING** |

1    ALFRED J. R. VILLALOBOS, ARVCO CAPITAL RESEARCH, LLC, ARVCO

2  FINANCIAL VENTURES, LLC, and ARVCO ART, INC., the jointly administered chapter 11

3  debtors and plaintiffs herein, hereby allege as follows:

4                               **Nature of the Action**

5    1.    This is an action against Defendants seeking, inter alia, (a) turnover of property of

6  the estate, (b) objection to claims filed and/or asserted by Defendants against the Debtor(s), (c) for

7  breach of oral contract, (d) breach of written contract, (e) interference with contract, (f) for

8  quantum meruit, (g) for equitable indemnification, (h) contractual indemnification, (i) for an

9  accounting, and (j) for damages.

10                              **Jurisdiction and Venue**

11    2.    This Court has jurisdiction over the parties and the claims set forth in this matter

12  pursuant to 28 U.S.C. §§ 151, 157 and 1334.

13    3.    The statutory predicates for this adversary proceeding include, without limitation,

14  sections 105, 541, 542, 544, 545, 550 and 551 of title 11 of the United States Code (the

15  "Bankruptcy Code"), and Rules 7001(1) and 7001(2) of the Federal Rules of Bankruptcy

16  Procedure (the "Bankruptcy Rules").

17    4.    This adversary proceeding arises in the following bankruptcy cases pending in the

18  United States Bankruptcy Court, District of Nevada (the "Bankruptcy Cases"): (a) *In re Alfred J.R.*

19  *Villalobos*, Bankr. Case No. 3:10-bk-52248-gwz; (b) *In re Arvco Capital Research, LLC*, Bankr.

20  Case No. 3:10-bk-52249-gwz; (c) *In re Arvco Financial Ventures, LLC*, Bankr. Case No. 3:10-bk-

21  52251-gwz; and (d) *In re Arvco Art, Inc.*, Bankr. Case No. 3:10-bk-52252.

22    5.    On June 9, 2010 (the "Petition Date"), ALFRED J. R. VILLALOBOS, ARVCO

23  CAPITAL RESEARCH, LLC, ARVCO FINANCIAL VENTURES, LLC and ARVCO ART,

24  INC. (collectively, the "Debtors" or "Plaintiffs") filed voluntary petitions for relief under chapter

25  11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy

26  Court for the District of Nevada.  On July 12, 2010, the Bankruptcy Court entered its Order

27  Authorizing Joint Administration for all four Debtors, which authorized the joint administration of

28

1  the Debtors under *In re Villalobos*, Bankr. Case No. 3:10-bk-52248-gwz.

2        6.     On April 1, 2013, the Bankruptcy Court entered an order (the "Confirmation

3  Order") confirming the Debtors' Corrected and Revised First Amended Plan of Liquidation

4  (together with any and all amendments thereto, all exhibits and schedules thereto and all

5  documents incorporated by reference therein the "Plan")[Doc. No. 1674].  Also on April 1, 2013,

6  the Bankruptcy Court entered its *Findings of Fact and Conclusions of Law in Support of Order*

7  *Confirming Corrected and Revised First Amended Jointly Administered Debtors' Plan of*

8  *Liquidation, as Amended* [Doc. No. 1673](the "Findings of Fact").  The Debtors expect that the

9  Plan will become effective on May 1, 2013 (the "Effective Date"). Pursuant to the Confirmation

10  Order and the Plan, on the Effective Date, the assets, liabilities, and corporate entities of the

11  Debtors will be substantively consolidated for purposes of the Plan.

12        7.     Pursuant to the Plan, on the Effective Date, Jeffrey L. Hartman (the "Liquidating

13  Trustee") will become the duly appointed Liquidating Trustee for the Villalobos Liquidating

14  Trust, and will succeed to all of the rights and powers of a debtor-in-possession under sections

15  1107 and 1108 of the Bankruptcy Code, and will be entrusted to administer the Villalobos

16  Liquidating Trust (the "Trust"), and its assets, and make distributions from the proceeds of the

17  Trust in accordance with the Plan.  Upon the Effective Date, the Liquidating Trustee will become

18  the real party in interest in this adversary proceeding and will substitute in as the plaintiff.

19        8.     This action is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E) and

20  (O).

21        9.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409 because the

22  Bankruptcy Cases are pending in the District of Nevada.

23        10.    Pursuant to Local Bankruptcy Rule 7008.1(a), Plaintiffs consent to the entry of

24  final orders or judgment by the Bankruptcy Court if it is determined that the Bankruptcy Court,

25  absent consent of the parties, cannot enter final orders or judgment consistent with Article III of

26  the United States Constitution.

27

28

1337661.2

-3-

**Parties**

11.    The Plaintiffs are the Debtors, who bring this adversary proceeding on behalf of their bankruptcy estates and for the benefit of their bankruptcy estates.

12.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO MANAGEMENT, L.P. ("Apollo Management") is, and at all times relevant herein was, a Delaware limited partnership, conducting business in the State of California.

13.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO MANAGEMENT VII, L.P. ("Apollo Management VII") is, and at all times relevant herein was, a Delaware limited partnership, conducting business in the State of California.

14.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO INVESTMENT FUND VII, L.P. ("Apollo Investment Fund VII") is, and at all times relevant herein was, a Delaware limited partnership, conducting business in the State of California.

15.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO OVERSEAS PARTNERS (DELAWARE 892) VII, L.P. ("Apollo Overseas Partners 892 VII") is, and at all times relevant herein was, a Delaware limited partnership, conducting business in the State of California.

16.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO OVERSEAS PARTNERS (DELAWARE) VII, L.P. ("Apollo Overseas Partners DE VII") is, and at all times relevant herein was, a Delaware limited partnership, conducting business in the State of California.

17.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO OVERSEAS PARTNERS VII, L.P. ("Apollo Overseas Partners VII") is, and at all times relevant herein was, a Delaware limited partnership, conducting business in the State of California.  This company may be a parallel entity formed for a specific foreign investment accommodation.

18.    Plaintiffs are informed and believe, and on that basis allege, that defendant APOLLO CREDIT OPPORTUNITY MANAGEMENT LLC  ("Apollo Credit Opportunity

1  Management") is, and at all times relevant herein was, a Delaware limited partnership, conducting

2  business in the State of California.

3         19.    Plaintiffs are informed and believe, and on that basis allege, that defendant

4  APOLLO CREDIT OPPORTUNITY FUND I, L.P. ("ACOF") is, and at all times relevant herein

5  was, a Delaware limited partnership, conducting business in the State of California.

6  **General Allegations**

7         20.    Whenever in this complaint reference is made to any act of a "Defendant", such

8  allegation shall be deemed to mean the acts of the defendants Apollo Management, Apollo

9  Management VII, Apollo Investment Fund VII, Apollo Overseas Partners 892 VII, Apollo

10 Overseas Partners DE VII and Apollo Overseas Partners VII, Apollo Credit Opportunity

11 Management LLC, Apollo Credit Opportunity Fund I, L.P., and each of them, acting individually,

12 jointly and severally unless otherwise stated.  Whenever in this complaint reference is made to

13 "Apollo" the complaint refers to any one of the Apollo companies or entities that either are a party

14 to this complaint and/or affiliated in some fashion with a Defendant to this complaint.

15 **Factual Allegations**

16 **A.    General background.**

17        22.    The Bankruptcy Cases were commenced on June 9, 2010 (previously defined as the

18 "Petition Date"), and on July 12, 2010, the Bankruptcy Court approved the joint administration of

19 the Bankruptcy Cases under *In re Alfred J.R. Villalobos*, Bankr. Case No. 3:10-bk-52248-gwz (the

20 "Villalobos Case").  Unless reference is otherwise noted, all references to the "docket" refer to the

21 docket in the Villalobos Case.

22        23.    As of the Petition Date, ALFRED J.R. VILLALOBOS ("Villalobos") was a

23 resident of Douglas County, Nevada and was the majority owner of each of the three (3) other

24 jointly administered Debtors - ARVCO CAPITAL RESEARCH, LLC ("ACR"), ARVCO

25 FINANCIAL VENTURES, LLC ("AFV") and ARVCO ART, INC. ("AAI").  Villalobos was in

26 private investment banking for approximately thirty (30) years prior to the Petition Date and, as of

27 the Petition Date, Villalobos was the managing member and chairman of AFV, which was a

28

1337661.2                                    -5-

1  broker/dealer/member of the Financial Industrial Regulatory Authority ("FINRA"), and the

2  Securities Investor Protection Corporation.  As of the Petition Date, Villalobos held series 7, 63,

3  24 and 79 securities licenses and was approved as a broker dealer in all fifty states and the

4  territories of the United States.

5       24.    As of the Petition Date, Villalobos also served as the managing member of ACR

6  and was the 99% owner of ACR.  ACR was formed by Villalobos in December of 2005 and was

7  an active company until the second quarter of 2008.  From its inception until the end of the second

8  quarter of 2008, ACR provided a variety of services including research, financial analysis and

9  consulting services to its private equity firm clients.  ACR has not operated since the end of the

10  second quarter of 2008 except to collect receivables and pay obligations.

11       25.    In or about the first quarter of 2008, representatives from Apollo recommended to

12  Villalobos that he register ACR as a broker-dealer with the SEC and FINRA.  Representatives

13  from Apollo also indicated that they wished Villalobos and his companies to continue working for

14  Apollo during the registration process in his capacity as a placement agent and consultant for

15  Apollo.  Shortly thereafter, Villalobos was advised by ACR's professionals that in order to obtain

16  broker-dealer registration, he would need to first cease the operations of ACR and then form a new

17  entity that would apply to be a broker-dealer.  Subsequently, Villalobos formed AFV.

18       26.    From its inception in July of 2008 until May 5, 2010, AFV provided a variety of

19  services such as research, financial analysis and consulting services to its private equity firm

20  clients.  AFV has not conducted business since May 5, 2010 and subsequently withdrew its

21  broker-dealer membership from FINRA and the SIPC.

22  **B.       The Debtors' Placement Agent Services.**

23       27.    Pre-petition and in addition to the research, financial analysis, and consulting

24  services referenced above, ACR and AFV served as a "placement agent" for its private equity firm

25  clients. Typically, a placement agent, as understood by the contracting parties involved, is an

26  individual or entity engaged by a company for the purpose of researching, analyzing and

27  identifying potential institutional investors for the specific manager of the private equity firm

28

1337661.2                                    -6-

and/or its fund.   As placement agent, ACR would introduce its private equity firm clients' management teams to prospective institutional investors.  From time to time ACR also provided logistical support when specifically requested to by the manager of the private equity firm, and such logistical support was provided under the direction of the private equity firm, ACR's client(s).   Apollo representatives have consistently indicated that Apollo did nothing wrong by utilizing placement agents such as DLJ, JP Morgan or ACR.

28.    For successfully identifying an institutional investor who ultimately invested in the subject fund, ACR would typically receive a placement agent fee from the private equity firm client usually in the amount of 1-2% of the funds invested in the specific private equity fund(s). The fee charged by ACR was typically lower than industry average.  The fees would be paid to ACR by its private equity firm clients and were not paid by the institutional investors that made the investments.  However, the CEO of Apollo Global Management and its predecessors, Leon Black, typically reserved the right to set the fee at his discretion up through and subsequent to each fund's final closing. This resulted in an inability to actually determine the exact amount of the fees until the closing of the various funds as well as caused several last minute changes to be made to the acknowledgement of disclosure forms, if any were even requested by Black or the Apollo companies for a particular fund.  It is clear that such forms were in no way ever required under the law as this is documented by an SEC issued publication.

29.    The Debtors are informed and believe, and based thereon allege, that the SEC has stated that acknowledgment of disclosure forms are not required either for record keeping of a private equity firm such as Apollo, or for any other reason at the time the relevant facts at issue in this complaint occurred.   Therefore, Apollo typically did not request such forms from ACR prior to paying ACR.

30.    The placement agent relationship between ACR and Apollo was, at times, memorialized in placement agent agreement letters which letters included fees that could be changed at Mr. Black's discretion.  With respect to the accounts receivable at issue in this complaint, the amounts due and owing to ACR were determined prior to or at the final closings

1337661.2                                    -7-

and were agreed to between the parties.  The institutional investors were never a party to any agreements, written or verbal, between ACR, on the one hand, and Apollo, on the other hand. With respect to the written agreements, an authorized representative of ACR would sign the placement agent agreement and/or letter on behalf of ACR, and a similarly authorized representative would sign on behalf of Apollo.

31.     The written placement agent agreements which are the subject of this complaint were memorialized in written letters dated July 1, 2007 for the Apollo Investment Fund VII agreement and June 19, 2008 for the ACOF agreement respectively.  In the Apollo Investment Fund VII, L.P. and the ACOF I  agreements, the parties specifically set forth the fact that ACR was not authorized to sell securities to any person or party, that ACR did not have the ability to bind Apollo entities in any way and that ACR could not accept subscriptions or participate in any selling of such securities but rather that ACR would merely act to serve as one of Apollo's many placement agents and would assist Apollo by using its reasonable best efforts to assist in identifying institutional investors for Apollo.  The language of the agreements clearly states that "[ACR] shall not offer or sell Interests to any person."

32.     Furthermore, Apollo represents in both agreements that ACR can use and reasonably rely on the Private Placement Memorandum and other provided Apollo data without being responsible for having independently verified the information contained therein.   ACR could not and did not negotiate terms or conditions relating to any of the agreements entered into between Apollo and its investors.

33.     In the section of the agreement regarding fees, the Apollo Investment Fund VII placement agent letter/agreement states that "Apollo may terminate this Agreement at any time if it determines not to proceed with the offering of Interest to prospective investors as contemplated herein." The agreement also clearly states that "Notwithstanding the termination of ACR's engagement hereunder, payment of any Fees and reimbursement of any Expenses accrued and/or owing as of the date of termination shall nevertheless be made in accordance with the terms hereof.

34.     Apollo has never terminated the subject Apollo Investment Fund VII placement agent letter/agreement nor the ACOF placement agent letter/agreement.

35.     In the Apollo Investment Fund VII placement agent letter/agreement, Apollo claims status as a Registered Investment Advisor under the U.S. Investment Advisers Act of 1940, as amended ("the "Advisers Act").  As such, it adopted and published the Apollo Global Management, LLC Code of Business Conduct and Ethics.  Under its conduct code, Apollo represents to all persons that all of its business will be "conducted in accordance with applicable federal, state and local laws and regulations, the applicable laws and regulations of any foreign jurisdictions where we operate, … . .in a manner that will reflect a higher standard of ethics. … Compliance with the law does not comprise our entire ethical responsibility; rather, it is a minimum, absolutely essential condition for performance of our duties.  Perceived pressure from supervisors or demands due to business conditions are not excuses for violating the law."   "Gifts to government officials or public employees who are not members of your immediate family given in your professional or personal capacity" are featured in the conflict of interest provisions of this ethical code. Apollo clearly warns that "Civil laws, criminal laws and regulations vary by jurisdiction regarding interactions with public officials." *See,* the pdf of the above code of ethics on Apollo's Website (http://ir.agm.com/phoenix.zhtml?c=214560&p=irol-govhighlights).  Similar representations regarding Apollo's compliance with the U.S. Investment Company Act of 1940 are included in the ACOF agreement as well.

36.     Despite the representation in the agreements and despite the language of the Apollo Code of Ethics specifically regarding gifts, Apollo failed to comply with its reporting obligations when dealing with its largest institutional investor, the California Public Employees' Retirement System ("CalPERS").  Apollo, a vendor/contractor of CalPERS, failed to abide by the duties and obligations as set forth in the Schiff Act of 1998 as introduced by SB 1753 and which was sponsored by CalPERS and which added language to California Education Code §22363 as well as to the California Government Code and required reporting to CalPERS of any gifts aggregating $50 or more that the vendor or contractor has made during the preceding calendar year to any

1   board member of officer or employee of the system.  Failure to disclose is highly important as, in

2   the event gifts aggregating $50.00 or more are given by a vendor or contractor to any board

3   member or officer, such an act could result in a disqualification of the contractor or the vendor

4   from consideration when an investment is being presented to CalPERS as an institutional investor

5   by Apollo.  Villalobos/ACR always sent any/all invoices for expenses and costs expended when

6   working for Apollo on CalPERS matters to Apollo for reimbursement and all expenses were

7   always paid in due course without exception by Apollo.

8        37.    ACR relied upon Apollo's representation both as a Registered Investment Advisor

9   and a party to the contract that Apollo would abide by the law.  If Apollo had fulfilled its

10  obligations as a vendor/contractor of CalPERS under the Schiff Act, then ACR would not have

11  sustained damages resulting from having to defend itself in the Santa Monica State Court Action

12  for securities fraud, nor the SEC action for securities fraud, nor would it have had to declare

13  bankruptcy and had to incur the resultant attorneys' and other professional fees incurred due to

14  that process.  Had Apollo properly disclosed the gifts it gave to such CalPERS persons such as

15  Leon Shahinian, which were featured in the Report of the CalPERS Special Review and contained

16  in the allegations of the CA State Court Action (defined below), such reports and lawsuits would

17  not have ensued and caused ACR damages. *See*, *Report of the CalPERS Special Review* written by

18  Philip S. Khinda, Donald E. Wellington and Ellen S. Zimiles (March 2011) located at

19  http://www.calpers.ca.gov/eip-docs/about/board-cal-agenda/agendas/full/201103/srrr.pdf.

20  Further, had Apollo properly disclosed the gifts it gave to such persons at CalPERS as per its

21  obligations under the Schiff Act, then the substantial business losses and damages sustained by

22  ACR and AFV due to all of the unsubstantiated and unprovable allegations of the *Report of the*

23  *CalPERS Special Review* written by Philip S. Khinda, Donald E. Wellington and Ellen S. Zimiles

24  and related to the CA State Court Action (defined below) would never have ensued.  In addition to

25  violating the Schiff Act,  Plaintiffs allege that Apollo Global Management made an agreement to

26  make future payments and may in fact have already made payments to CalPERS in order to seek

27  and maintain CalPERS' business. This practice is commonly known in the industry as "Pay to

28

Play." The letter signed by Mr. Black at the end of the Report of the CalPERS Special Review cited above memorializes this agreement and evidence exists documenting that there was no reason other than simply making payments to keep CalPERS' business that the agreement was penned and signed. According to an Apollo representative, Apollo made the payments in the hope for a "healthy ongoing relationship" as opposed to compensating CalPERS for any damages caused by Apollo or any placement agent activities.

**C.    Events Leading to the Commencement of the Bankruptcy Cases.**

36.    The Debtors commenced their Bankruptcy Cases in response to legal action commenced by the State of California against two of the Debtors.  On May 5, 2010, the People of the State of California filed a complaint (the "Complaint") in the Superior Court of the State of California, County of Los Angeles, West District ("CA State Court") styled *The People of the State of California v. Alfred J.R. Villalobos, ARVCO Capital Research, LLC, Federico R. Buenrostro, JR., and DOES 1-100, Inclusive*, Case No. SC 107850 (the "CA State Court Action"). The Complaint erroneously alleges that between 2005 and 2008, Villalobos committed securities fraud by failing to disclose to California Public Employees' Retirement System ("CalPERS") that Villalobos, by and through ACR: (1) served as placement agent for two (2) private equity firms in which CalPERS invested; (2) received fees from two (2) private equity firms; (3) did not have a broker-dealer license; and (4) allegedly gave gifts to CalPERS personnel to bribe them and thereby exert undue influence over CalPERS' investment decisions.  The Complaint alleges that the aforementioned acts constitute a violation of California Corporations Code Sections 2521(a) and 25403 with respect to the alleged securities fraud by a broker-dealer in violation of California Corporations Code Sections 25210 and 25403 regarding alleged licensed broker-dealer activity, as well as violations of Business and Professions Code Section 17200 for alleged unlawful and/or fraudulent business practices. It should be noted that had Apollo properly fulfilled its obligations under the Schiff Act, most of the above allegations never could have been made as Apollo and other investment managers/vendors contributed and/or paid for the gifts which are the subject of the civil action.

37.     On May 5, 2010, without any notice to Villalobos or ACR, the State of California Attorney General's Office ("AG") sought and obtained a temporary restraining order (the "TRO") from the CA State Court freezing all assets under Villalobos' control including, but not limited to, all bank accounts, real property, vehicles and art work and placing them in the custody of a Court appointed receiver, David R. Pasternak (the "Receiver").   In support of the TRO, the AG alleged that Villalobos sold securities through a fraudulent scheme consisting of, among other things, failing to disclose: (1) placement agent agreements and the fees he received even though he was not contractually or legally required to make such disclosures; and (2) gifts and gratuities (in the form of food, drinks, lodging and entertainment) to Federico R. Buenrostro, Jr. ("Buenrostro"), CalPERS former CEO, Charles Valdes, a former CalPERS board member and Leon Shahinian, CalPERS' Senior Investment Officer.   Approximately two weeks later, the CA State Court granted the AG's request to turn the TRO into a permanent injunction, which froze all of Villalobos' assets.   The asset freeze forced Villalobos to cease all operations of AFV, which was not a defendant in the CA State Court Action. The cessation of all business operations resulted in Villalobos not having access to any of his assets and in Villalobos not being able to earn a living to support himself and his family.   Consequently, on June 9, 2010, the Debtors commenced their Bankruptcy Cases.

**D.     Apollo.**

38.     Apollo Global Management (previously defined as "Apollo") is a leading global private equity firm, the predecessor of which was founded in 1990, and which has grown to become one of the world's largest alternative investment managers.   As of June 30, 2012, it had total assets under management of approximately $105 billion U.S. dollars, with a team of 616 employees located in ten offices around the world; however, some of these offices, such as the one located in Los Angeles, California, apparently operate without identifying a registered agent for service of process.   Apollo manages private equity investment funds ranging in value from hundreds of millions to tens of billions of dollars.   Apollo utilized ACR as a placement agent to research,  analyze and identify prospective institutional investors for certain of its investment

funds from 1997 to sometime after the CA State Court Action was filed in 2010.  At the present time Apollo manages approximately $5,000,000,000.00 of CalPERS' money.  All of the Apollo funds for which ACR introduced CalPERS have been earning outstanding profits for CalPERS and its retirees.  It is also clear from testimony and evidence that at no time did CalPERS ever pay ACR any money for any services.

39.     Prior to the Petition Date, Villalobos and ACR had a long standing relationship with Apollo Management and Leon Black, a founding member and the Chief Executive Officer ("CEO") of Apollo.

40.     From 2005 – 2008, ACR and Apollo (or one of its related entities) entered into nine placement agent agreements and several other "handshake deals for quasi placement agent services and/or consulting assistance"  These agreements were either memorialized in writing or were oral agreements.   Nine of these agreements were related to the following specified funds and can be summarized as follows:

(i)     Apollo VI, L.P. : This fund involved a $650 million investment and was originated on August 12, 2005.  The placement agreement was dated May 25, 2005 and amended on February 1, 2006.  No acknowledgement of disclosure forms were requested by Apollo or provided by ACR.  Payments pursuant to the agreement occurred during 2006 - 2008.

(ii)    Apollo Alternative Assets, L.P.:  This fund involved a $200 million investment.  This placement agent agreement was oral and was entered into in during the spring of 2006.  The date of the investment was July 27, 2006. No acknowledgement of disclosure forms were required by Apollo and ACR did not provide any forms.  Payments pursuant to this agreement were made in 2006.

(iii)   Apollo Management VII, L.P.:  This fund involved a $1 billion investment. The placement agent agreement was dated July 1, 2007.  This agreement required disclosure forms prior to Apollo receiving subscriptions from its investors; however, disclosure forms were not obtained by  Apollo (or requested by Apollo)

1   until after the subscription agreements and were signed by Apollo and its investors.

2   The CalPERS/Apollo subscription agreement was dated 8/17/2007.  The

3   investment occurred on August 30, 2007 and the Acknowledgment of Disclosure

4   Form was dated November 20, 2007, and received by Apollo on or about January

5   7, 2008.  Payments were made to ACR in 2008 and 2009.  Still owing for payments

6   due in 2010 is $1,375,000 related to the CalPERS and Oregon investments and

7   $387,500 from NYC, NY, UC System investments. Still owing for payments due in

8   2011 related to the CalPERS and Oregon investments is $1,375,000.  Still owing

9   related to the NYC, NY, and UC System investments for payments due in 2010 is

10  .the  $387,500.

11  (iv)    Apollo Global Management LLC/Apollo Strategic Investment: This fund

12  involved a $601 million investment by CalPERS in July of 2007.  The placement

13  agent agreement was oral. No acknowledgement of disclosure forms were ever

14  requested by Apollo or provided by ACR to Apollo.  Payments totaling $13.2

15  million dollars were made in July and August of 2007.

16  (v)    Apollo Europe Management , L.P./AP Investment Europe Limited/AIE

17  (collectively): These funds involved a $75 million investment in September of

18  2007.  The placement agent agreement was dated January 25, 2008.  The disclosure

19  letter was dated November 11, 2007 and received by Apollo on or about February

20  6, 2008.   A payment totaling $625,000.00 was made pursuant to this agreement in

21  April of 2008.

22  (vi)    Apollo European Principal Finance Fund, L.P. /EPF:  This fund involved a

23  $50 million investment which was originated on February 29, 2008.  The

24  placement agent agreement was dated January 25, 2008.  The acknowledgement of

25  disclosure letter was dated January 11, 2008  and received by Apollo on or about

26  February 6, 2008.  A payment totaling $375,000.00 was made by Apollo to ARC

27  on April 16, 2008.

28

       (vii)    <u>Apollo Credit Opportunity Fund I Management, LLC</u>:  This fund involved an investment of $1 billion and was originated on April 15, 2008.  The investor disclosure letter was dated May 20, 2008.  The placement agent agreement was dated May 10, 2008.  Payments totaling $4,166,667 was made on June 16, 2008 prior to receipt of an Acknowledgment of Disclosure Letter by Apollo and payments of $3,404,166 was made on January 15, 2009 by  Apollo to ACR.  Still owing by Apollo to ARC/ARV is $1,500,000 for the CalPERS investment and $937,500 for the Oregon investment.

       (viii)    <u>Apollo Special Opportunities Managed Account, L.P.</u>:  This fund involved two $400 million investment by CalPERS.  There was a draft of a placement agent agreement prepared in March 2008 but that remained unsigned.  Thus the placement agreement for this Investment remained oral in nature. Acknowledgement of Disclosure letters were dated November 20, 2008 and May 20, 2008 reflecting the two different phases of investments into this Managed Account. Payments in the amount of $2,670,000 were made prior to  receipt of acknowledgement of disclosure letters and a payment of $830,000.00 was made subsequent to the receipt of an acknowledgement of disclosure letter.

    41.     Certain agreements between ACR/AFV and Apollo were more informal and known in the industry as "handshake deals" but were always honored by the parties.  ACR received compensation pursuant to these handshake deals with Apollo and Leon Black. As an example, as part of the payment terms of the Apollo Global Management deal, Leon Black agreed that ACR/Villalobos would have the exclusive right to serve as Apollo's agent and/or consultant for purposes of researching, analyzing and consulting for Apollo in identifying investments for Apollo with respect to CalPERS and all of the ACR/Villalobos target list institutional investors.

    42.     Plaintiffs are informed and believe, and based thereon allege, that the accounts receivable owed by Defendants to ACR/AFV pursuant to these handshake deals can only be determined and known through a full and complete accounting.

### FIRST CLAIM FOR RELIEF

### [For Turnover of Property of the Estate ~ 11 U.S.C.§ 542]

### [Against All Defendants]

43.     Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 42, inclusive, as if fully set forth herein.

44.     Plaintiffs are informed and believe, and based thereon allege, that the accounts receivable owed by Defendants to ACR constituted property of the Debtors' estates as of the Petition Date.

45.     Plaintiffs are informed and believe, and based thereon allege, that the Defendants have caused the assets identified above to be used for their own benefit and not for the benefit of the Debtors' estates.

46.     Plaintiffs are informed and believe, and based thereon allege, that the Defendants are in possession, custody or control of the aforedescribed property of the Debtors.

47.     Despite the fact that Section 542(a) of the Bankruptcy Code provides that "an entity … in possession, custody, or control … of property that the trustee may use, sell, or lease … shall deliver to the trustee … such property or the value of such property", Defendants have failed and refused, and continue to fail and refuse to turn over the aforedescribed property to the Debtors.

48.     Pursuant to Section 542, the Debtors are entitled to the turnover of the aforedescribed property from Defendants, and each of them.

49.     The aforedescribed property is not of inconsequential value and the turnover of the property will greatly benefit the Debtors' creditors.

### SECOND CLAIM FOR RELIEF

### For Objection/Denial of Claims

### [Against All Defendants]

50.     The Debtors reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 49, inclusive, as if fully set forth herein.

51.     Defendants are entities and/or individuals from which property of the estate is

1  recoverable under 11 U.S.C. §§ 542, 550 or 553.

2       52.    Defendants, and each of them, have not paid or turned over any such property for

3  which Defendants are liable under 11 U.S.C. §§ 542, 550 or 551.

4       53.    Pursuant to 11 U.S.C. 502(d), to the extent that any of the Defendants have claims

5  against the Debtors' estates and/or attempt to assert such claims in the future and/or attempt to set

6  off any claims against the Debtors' claims against Defendants, any such claim or claims should be

7  disallowed in their entirety.

8       54.    Defendants have asserted claims against the Debtors which should be disallowed

9  pursuant to 11 U.S.C. §502(b)(1) and which should be disallowed pursuant to 11 U.S.C. §502(e).

10  **THIRD CLAIM FOR RELIEF**

11  **[For Breach of Oral Contract]**

12  **[Against All Defendants]**

13       55.    The Debtors realleges and incorporate by reference each and every allegation

14  contained in paragraphs 1 through 53, inclusive, as if fully set forth herein.

15       56.    Villalobos and/or ACR/AFV entered into numerous oral agreements with

16  Defendants including those set forth in Paragraphs 1 to 40 above.  Typically, the fees of the oral

17  agreements (collectively, the "Oral Agreements") were evidenced, confirmed and paid by invoices

18  provided to Defendants by ACR.   Black and Villalobos further came to an agreement in August

19  of 2007 whereby Apollo agreed to use Villalobos' services for any future CalPERS related

20  potential investments.  Villalobos and/or ACR were paid pursuant to said agreement at the

21  closings of the SOMA fund, European Loan Fund and the European Distress Fund.

22       57.    ACR and AFV performed all of the conditions and covenants of the Oral

23  Agreements to be performed on their part except to the extent that such performance has been

24  prevented, excused, hindered or waived.

25       58.    To date, Defendants have received at least $1.6 billion in investments from

26  CalPERS relating to the Oral Agreements; however during the past three years there may have

27  been additional investments by CalPERS and other ACR-targeted institutional investors such as

28

Oregon, Texas Teachers, New York Common and New York City Funds for which Plaintiff requests an accounting.  Apollo has not reported such investments to any of the Debtors. Resulting from this intentional failure to report, the Debtors have thus been unable to ascertain how much more in fees may be owed by Defendants pursuant to the agreement that ACR would be compensated by Apollo for all future investments made by CalPERS and the other ACR-targeted investors into Apollo financial products.  Pursuant to the Oral Agreements, ACR and AFV have been paid $23,200,000.  However, given the intentional failure to report subsequent investments, the Debtors' estates may be owed additional sums by Defendants.

59.    As of the commencement of this complaint, Defendants have refused to pay the amounts owed to ACR and AFV pursuant to the Oral Agreements.

60.    As of the date of the filing of this complaint, no additional payments have been made by Defendants or any other party relating to these delinquent payments.

61.    By reason of the foregoing, the Debtors' have suffered general, special, consequential, and incidental damages in an amount to be determined at trial.  The exact amount of damage has not yet been ascertained but will be established according to proof at the time of trial.

**FOURTH CLAIM FOR RELIEF**

**[For Breach of Written Contract]**

**[Against All Defendants]**

62.    The Debtors reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 61, inclusive, as if fully set forth herein.

63.    As set forth in Paragraph 40 and its subparts above, ACR entered into a placement agent contract (the "Apollo VII Agreement") with Apollo Management VII, Apollo Investment Fund VII and related investment entities ("Apollo VII").  Apollo VII is an investment entity and fund created and management by Apollo.  Under the Apollo VII Agreement, ACR agreed to act as Apollo VII's placement agent to assist Apollo VII in finding potential investors for Apollo VII's fund.  CalPERS, Oregon, NYC, NY, and the UC System were among the prospective investors

that ACR identified for Apollo.  In return for ACR's services, Apollo VII agreed to pay ACR a fee equal to 1% of the capital contributions received and accepted by Apollo VII, subject to certain limitations.  After the Apollo VII Agreement was executed by Apollo VII and ACR, CalPERS, Oregon, NYC, NY and the University of California ("UC System") all invested in Apollo VII.  As a result of these investments, ACR was entitled to receive fees.  Apollo owes the Debtors payments due in 2010 related to the CalPERS and Oregon investments in the amount of $1,375,000.  Apollo owes the Debtors payments related to the NYC, NY, UC System investments for payments due in 2010 in the amount of $387,500.  Apollo owes the Debtors payments due in 2011 related to the CalPERS and Oregon investments in the amount of $1,375,000.

64.    As set forth in Paragraph 40 and its subparts above, ACR entered into a placement agent contract (the "ACOF Agreement") with Apollo Credit Opportunity Management.  Apollo Credit Opportunity Fund is an investment entity and fund created and management by Apollo.  Under the ACOF Agreement, ACR agreed to act as Apollo's placement agent to assist Apollo in finding potential investors for ACOF.   In return for ACR's services, Apollo agreed to pay ACR a fee based on a percentage of the capital contributions received and accepted by ACOF, subject to certain limitations.  After the ACOF Agreement was executed by Apollo and ACR, the target investors did invest.   As a result of these investments, ACR was entitled to receive fees. With regards to ACOF, Apollo owes ACR $1,500,000 relating to the CalPERS investment and $937,500 relating to the Oregon investment.

65.    ACR performed all terms, conditions and covenants of the Apollo VII Agreement except to the extent that such performance has been prevented, excused, hindered or waived.

66.    Notwithstanding the terms of the Apollo VII Agreement and the ACOF Agreement, Defendants materially breached the terms of the contracts in that, despite services having been fully performed,  on or after May 5, 2010, Defendants have failed and refused, and continue to fail and refuse, to pay the remaining $5,962,500 that is due ACR.

67.    Since June 9, 2010, the Debtors have made repeated demands upon Defendants for payment of these fees.  However, Defendants refuse to pay the amounts due.

68.    At all times material to this complaint, the Debtors possessed an economic relationship with their clients, employees, investors, creditors and other businesses containing the probability of future economic benefit to the Debtors.

69.    Defendants, and each of them, had actual knowledge of the existence of these relationships by virtue of the Defendants' business relationship with Villalobos and ACR over a fifteen year period.

70.    The Debtors are informed and believe, and based thereon allege, that Defendants engaged in negligent and/or intentional acts designed to disrupt the economic relationship the Debtors had with their clients, employees, investors, and other businesses containing the probability of future economic benefit.

71.    Actual disruption of the Debtors' relationships has occurred due to Defendants' acts.  The Debtors' assets were frozen in the CA State Court Action and transferred to the Receiver, thereby forcing the Debtors to commence the Bankruptcy Cases.  The Debtors have been sued by the AG and by the SEC based upon Defendants' failure to comply with state and federal laws requiring Defendants to disclose certain information to their investors.  But for Defendants' failure to comply with their legal duties, the Debtors would not have been forced to file the Bankruptcy Cases and defend themselves against multiple lawsuits and claims and any related expenses thereof.  To date there has been in excess of $6 million dollars in legal fees and expenses incurred by the bankruptcy estates. Additionally, as a further result of Defendants' actions or inactions with regards to a failure to report as required under the Schiff Act which was Apollo's obligation and duty under the law and the placement agent agreements, the Debtors, their estates and the creditors also suffered damages related to lost business opportunities with Apollo Global Mgmt., Aurora Capital partners, Pacific Corporate Group, Craton Capital Partners, Sanchez Oil Company, Klease Capital, Principle Capital Group, New Faze Capital, Ucayla Mgmt. Furthermore, due to the commencement of the Debtors' Bankruptcy Cases, the Debtors, their estates and their creditors suffered substantial real estate losses due to having to prematurely sell real estate and other assets.

72.     As a direct and proximate cause of Defendants' actions, the Debtors, their estates and their creditors have suffered damages in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF

### [For Interference with Contract]

### [Against All Defendants]

73.     The Debtors reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 72, inclusive, as if fully set forth herein.

74.     At all times material to this complaint, the Debtors possessed an economic relationship with their clients, employees, investors, creditors and other businesses containing the probability of future economic benefit to the Debtors.

75.     Defendants, and each of them, had actual knowledge of the existence of these relationships by virtue of the Defendants' business relationship with Villalobos and ACR over a fifteen year period.

76.     The Debtors are informed and believe, and based thereon allege, that Defendants engaged in negligent and/or intentional acts designed to disrupt the economic relationship the Debtors had with their clients, employees, investors, and other businesses containing the probability of future economic benefit.

77.     Actual disruption of the Debtors' relationships has occurred due to Defendants' acts.  The Debtors' assets were frozen in the CA State Court Action and transferred to the Receiver, thereby forcing the Debtors to commence the Bankruptcy Cases.  The Debtors have been sued by the AG and by the SEC based upon Defendants' failure to comply with state and federal laws requiring Defendants to disclose certain information to their investors.  But for Defendants' failure to comply with their legal duties, the Debtors would not have been forced to file the Bankruptcy Cases and defend themselves against multiple lawsuits and claims and any related expenses thereof.  To date there has been in excess of $6 million dollars in legal fees and expenses incurred by the bankruptcy estates. Additionally, as a further result of Defendants' actions or inactions with regards to a failure to report as required under the Schiff Act which was

1  Apollo's obligation and duty under the law and the placement agent agreements, the Debtors, their

2  estates and the creditors also suffered damages related to lost business opportunities with Apollo

3  Global Mgmt., Aurora Capital partners, Pacific Corporate Group, Craton Capital Partners,

4  Sanchez Oil Company, Klease Capital, Principle Capital Group, New Faze Capital, Ucayla Mgmt.

5  Furthermore, due to the commencement of the Debtors' Bankruptcy Cases, the Debtors, their

6  estates and their creditors suffered substantial losses due to having to prematurely sell real estate

7  and other assets.

8       78.    As a direct and proximate cause of Defendants' actions, the Debtors, their estates

9  and their creditors have suffered damages in an amount to be proven at trial.

10                          **SIXTH CLAIM FOR RELIEF**

11                              **[Quantum Meruit]**

12                          **[Against All Defendants]**

13       79.    The Debtors reallege, and incorporate by reference, each and every allegation

14  contained in paragraphs 1 through 78 above, inclusive as if fully set forth herein.

15       80.    ACR has provided valuable services to Defendants.

16       81.    ACR researched, analyzed and consulted for Apollo in identifying investments for

17  Apollo pursuant to their placement agent agreements between  2005-2008 and is still owed

18  pursuant to those agreements $5,962,500.00 in fees.

19       82.    Defendants were aware that ACR, in performing the services, expected to be paid

20  by Defendants.

21       83.    Although demand has been made, there is now due, owing and unpaid from the

22  Apollo VII Defendants and the ACOF Defendants to ACR the sum of at least $5,962,500.00 plus

23  additional amounts according to proof, together with interest thereon at the maximum rate allowed

24  by law.

25

26

27

28

**SEVENTH CLAIM FOR RELIEF**

**[For Equitable Indemnification]**

**[Against All Defendants]**

84.     The Debtors reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 83, inclusive, as if fully set forth herein.

85.     In Nevada, the elements of proof for one seeking equitable indemnity are: (a) indemnittee has discharged a legal obligation owed to a third party; (b) the party from whom it seeks liability also was liable to the third party; and (c) as between the claimant and the party from whom it seeks indemnity, the obligation ought to be discharged by the latter.

86.     Inherent in the terms of the Apollo VII Agreement and the ACOF Agreement as well as in the various oral agreements that existed between the parties is legal obligation to equitably indemnify the other from all liability, damage, loss, penalty, cost or expense, including reasonable attorneys' fees and cost of investigating and defending against lawsuits, such as Case No: SC 107850 styled *The People of the State of California, v. Alfred Robles Villalobos, ARVCO Capital Research, LLC, Federico R. Buenrostro Jr. and Does 1-100* filed in the Superior Court of the State of California, County of Los Angeles for Securities Fraud by a Broker-Dealer, Unlicensed Broker-Dealer Activity, and Unlawful and/or Fraudulent Business Practices, and Case No. 3:12-cv-00221-ECR-WGC, styled *Securities and Exchange Commission v ARVCO Capital Research, LLC, ARVCO Financial Ventures, LLC,, Alfred J.R. Villalobos, and Federico R. Buenrostro*, and any other complaints, investigations, actions or other pending or threatened litigation, arising out of or attributable to (a) gross negligence, willful misconduct or willful malfeasance in the performance of such Indemnifying Party's obligations hereunder or (b) a material breach of any agreement, covenant, obligation or representation made by such Indemnifying Party herein.

87.     Defendants engaged in acts which in turn disrupted the economic relationship the Debtors had with their clients, employees, investors, and other businesses containing the probability of future economic benefit.

88.     Actual disruption of these relationships has occurred due to the Defendants' actions.  The Debtors' assets were frozen in the CA State Court Action and transferred to the Receiver, thereby forcing the Debtors to commence the Bankruptcy Cases.  The Debtors have been sued by the AG and by the SEC based upon Defendants' failure to comply with state and federal laws requiring Defendants to disclose certain information to their investors.  But for Defendants' failure to comply with their legal duties, the Debtors would not have been forced to file the Bankruptcy Cases and defend themselves against multiple lawsuits and claims and any related expenses thereof.  To date there has been in excess of $6 million dollars in legal fees and expenses incurred by the bankruptcy estates. Additionally, as a further result of Defendants' actions or inactions with regards to a failure to report as required under the Schiff Act which was Apollo's obligation and duty under the law and the placement agent agreements,  the Debtors, their estates and the creditors also suffered damages related to lost business opportunities with Apollo Global Mgmt., Aurora Capital partners, Pacific Corporate Group, Craton Capital Partners, Sanchez Oil Company, Klease Capital, Principle Capital Group, New Faze Capital, Ucayla Mgmt. Furthermore, due to the commencement of the Bankruptcy Cases, the Debtors, their estates and their creditors suffered substantial real estate losses due to having to prematurely sell real estate. In addition to violating the Schiff Act, Plaintiffs herein allege that Apollo Global Management made an agreement to make future payments and may in fact have made payments to CalPERS in order to seek and maintain their business.  The letter signed by Mr. Black at the end of the Khinda Report  memorializes this agreement which is known in the industry as "pay to play" activities. (See the Khinda Report and attached letter agreement memorializing the payment arrangements: http://www.calpers.ca.gov/eip-docs/about/board-cal-agenda/agendas/full/201103/srrr.pdf).  Both of these actions seriously affected ACR and Villalobos and caused damage to the estates.

89.     As a direct and proximate cause of Defendants' actions, the Debtors, their estates and their creditors have suffered damages in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**

**[For Contractual Indemnification]**

**[Against All Defendants]**

90.    The Debtors reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 89, inclusive, as if fully set forth herein.

91.    Contractual indemnity arises when two parties in a contract agree that one will reimburse the other for liability resulting from the former's work.  Typically, the scope of a contractual indemnity clause is determined by the contract and not the independent doctrine of equitable indemnity.

92.    Paragraph 6 of the Apollo VII Agreement provides that Apollo VII and ACR each agree "to indemnify and hold harmless the other and the other's affiliates … from and against all liability, damage, loss, penalty, cost or expense, including reasonable attorneys' fees and cost of investigating and defending against lawsuits, complaints, investigations, actions or other pending or threatened litigation, arising out of or attributable to (a) gross negligence, willful misconduct or willful malfeasance in the performance of such Indemnifying Party's obligations hereunder or (b) a material breach of any agreement, covenant, obligation or representation made by such Indemnifying Party herein."

93.    At all times material to this complaint, the Debtors possessed an economic relationship with their clients, employees, investors, creditors and other businesses containing the probability of future economic benefit to the Debtors.

94.    Defendants, and each of them, had actual knowledge of the existence of these relationships by virtue of the Defendants' business relationship with Villalobos and ACR over a fifteen year period.

95.     Defendants engaged in acts designed to disrupt the economic relationship the Debtors had with their clients, employees, investors, and other businesses containing the probability of future economic benefit.

96.    Actual disruption of these relationships has occurred due to Defendants' actions.

The Debtors' assets were frozen in the CA State Court Action and transferred to the Receiver, thereby forcing the Debtors to commence the Bankruptcy Cases.  The Debtors have been sued by the AG and by the SEC based upon Defendants' failure to comply with state and federal laws requiring Defendants to disclose certain information to their investors.  But for Defendants' failure to comply with their legal duties, the Debtors would not have been forced to file the Bankruptcy Cases and defend themselves against multiple lawsuits and claims and any related expenses thereof.  To date there has been in excess of $6 million dollars in legal fees and expenses incurred by the bankruptcy estates. Additionally, as a further result of Defendants' actions or inactions with regards to a failure to report as required under the Schiff Act which was Apollo's obligation and duty under the law and the placement agent agreements, the Debtors, their estates and their creditors also suffered damages related to lost business opportunities with Apollo Global Mgmt., Aurora Capital partners, Pacific Corporate Group, Craton Capital Partners, Sanchez Oil Company, Klease Capital, Principle Capital Group, New Faze Capital, Ucayla Mgmt. Furthermore, due to the commencement of the Bankruptcy Cases, the Debtors, their estates and their creditors suffered substantial losses due to having to prematurely sell real estate and other assets.

97.    As a direct and proximate cause of Defendants' actions, the Debtors, their estates and their creditors have suffered damages in an amount to be proven at trial.

**NINTH CLAIM FOR RELIEF**

**[An Accounting]**

**[Against All Defendants]**

98.    The Debtors reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 97, inclusive, as if fully set forth herein.

99.    An accounting is required in order to ascertain the extent of the Debtors' claims against the Defendants and in order to properly identify the assets of the estates.

100.    Each Defendant should be ordered and compelled to provide a complete and accurate accounting to Plaintiffs of the following: (a) any cash or cash equivalent paid to any Defendant (or any affiliated entity or person) by any of the Debtors' clients, the source and

1    identification of any such payor made to or for the benefit of any Defendant, and any

2    consideration received by the Defendants in exchange for such payment; and (b) for any and all of

3    the Debtor's and/or the Defendants' contracts and/or agreements with third parties for which the

4    Debtors and their estates did not receive any payments.

5        101.    The Defendants should be ordered and compelled to provide a complete and

6    accurate accounting of all funds relating to the Apollo VII Fund and relating to the Credit

7    Opportunity Fund as well as an accounting of any/all investments made into Apollo by prior ACR

8    and/or Villalobos' target lists of institutional investors as identified in the various oral and/or letter

9    agreements between Apollo and ACR.

10        WHEREFORE, the Debtors respectfully request that this Court enter a judgment in favor

11    of their estates as follows:

12        A.    For amounts due and owing under Apollo Investment Fund VII and the ACOF

13    Agreements and any other amounts based upon the oral agreements as proven at trial.

14        B.    Denying Apollo's Proof of Claim in its entirety including, but not limited to, any

15    claim of offset or other equitable relief such as recoupment as set forth in Apollo's Proof of Claim.

16        C.    For legal fees and expenses caused by the actions or failure to act by Apollo as set

17    forth above in paragraphs 71 and 88.

18        D.    For consequential and/or damages to ACR/AFV business entities and potential

19    business relationships and contractual relationships as set forth above in paragraph 88.

20    DATED: April 15, 2013                    WOLF, RIFKIN, SHAPIRO,
21                                             SCHULMAN & RABKIN, LLP

22

23                                    By:        /s/ Susan K. Seflin
24                                             SHEILA VAN DUYNE ROMERO
                                               SUSAN K. SEFLIN
25                                             Special Litigation Counsel for Chapter 11 Debtors

26

27

28