_____
Honorable Gregg W. Zive
United States Bankruptcy Judge

Entered on Docket
October 01, 2018

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

ALFRED J.R. VILLALOBOS, an individual,

☐ Affects this Debtor
☒ Affects all Debtors
☐ Affects Arvco Capital Research, LLC
☐ Affects Arvco Financial Ventures, LLC
☐ Affects Arvco Art, Inc.

Debtors.
_____

CHRISTINA W. LOVATO,

Plaintiff,

vs.

APOLLO MANAGEMENT, L.P., APOLLO
MANAGEMENT VII, L.P., APOLLO
INVESTMENT FUND VII, L.P., APOLLO
OVERSEAS PARTNER (DELAWARE 892)
VII, L.P., APOLLO OVERSEAS PARTNERS
(DELAWARE) VII, L.P., APOLLO OVERSEAS
PARTNERS VII, L.P., APOLLO CREDIT
OPPORTUNITY MANAGEMENT LLC, and
APOLLO CREDIT OPPORTUNITY FUND I,
L.P.,

Defendants.

Bankruptcy No.: 3:10-bk-52248-gwz

Chapter 7

Adv. Proceeding No. 3:13-ap-05017-gwz

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**

The Court, after reviewing and considering the Second Amended Complaint (ECF No.

106), the transcript of the Court's hearing on March 20, 2017 (ECF No. 130), Defendants'

4816-2746-2004

Answer to the Second Amended Complaint and Counterclaim for Breach of Contract (ECF No. 133), the Court's Order Dismissing Without Prejudice Counts Three, Four and Five of the Second Amended Complaint (ECF No. 134), the Answer to Counterclaim (ECF No. 138), Defendants' Motion for Summary Judgment (ECF No. 157), the Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment (ECF No. 158), the Declaration of Gregory F. Laufer in Support of Defendants' Motion for Summary Judgment and the exhibits thereto (ECF No. 159), the Declaration of John Suydam (ECF No. 160), Plaintiff's Opposition to Defendants' Motion for Summary Judgment (ECF No. 181), Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment (ECF No. 183), the transcript of the Court's hearing on May 10, 2018 (ECF No. 190), Plaintiff's Supplemental Opposition to Defendant's [sic] Motion for Summary Judgment (ECF No. 196), the Declaration of Marc E. Rohatiner in Opposition to Motion for Summary Judgment (ECF No. 197), Defendants' Supplemental Memorandum of Law in Further Support of Their Motion for Summary Judgment (ECF No. 198), and the Supplemental Declaration of Gregory F. Laufer in Support of Defendants' Motion for Summary Judgment and the exhibits thereto (ECF No. 199), and after stating its findings of fact and conclusions of law orally on the record pursuant to Fed. R. Bankr. P. 9014, 7052 and Fed. R. Civ. P. 52(a), now incorporates its oral findings of fact and conclusions of law by reference and hereby enters its written Findings of Fact and Conclusions of Law as follows.  The findings of fact below are based on the Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment (ECF No. 158), which the Court has found to be undisputed for purposes of deciding Defendants' Motion for Summary Judgment (ECF No. 157).

/ / /

/ / /

4816-2746-2004

**FINDINGS OF FACT**

**A.    The Parties**

1.    Apollo Global Management, LLC ("AGM"), Apollo Management, L.P. ("Apollo Management," and with AGM, "Apollo"), and related entities, including Defendants, comprise one of the world's largest alternative asset managers.

2.    Alfred J.R. Villalobos ("Mr. Villalobos") was a Managing Member and the principal of Arvco Capital Research, LLC ("Arvco") from at least 2005 through at least June 2010.  Arvco is a Nevada limited liability company.  Arvco Financial Ventures, LLC, of which Mr. Villalobos was the Managing Member from July 2008 until July 2011, is a Nevada limited liability company.  Arvco Art, Inc., of which Mr. Villalobos was the President, Secretary, Treasurer, and Director from December 2006 until December 2011, is a Nevada domestic corporation.

3.    Christina Lovato is the Chapter 7 trustee for Arvco.

**B.    Background**

4.    In March 2007, Apollo Management registered as an Investment Adviser under the Investment Advisers Act of 1940 (the "Advisers Act" or the "Act").

5.    Upon registering as an Investment Adviser, Apollo Management became subject to various rules and regulations promulgated by the U.S. Securities and Exchange Commission ("SEC").  Accordingly, Apollo Management revised its policies and procedures to ensure compliance with the Advisers Act, including its rules and regulations.

6.    Among the rules and regulations that govern registered Investment Advisers is Advisers Act Rule 206(4)-3, the so-called "Cash Solicitation Rule," which sets out certain requirements with respect to an Investment Adviser's use of a third party to solicit an investment from an outside investor.

7.    A "placement agent" is an individual or firm who, among other things, assists fund managers in marketing an investment fund that they manage to one or more potential investors,

and who generally receives a fee based on the amount of any resulting investments by those investors.

8.      In the spring of 2007, Apollo Management implemented a new policy requiring placement agents working on behalf of funds managed by Apollo affiliates to procure from each investor a disclosure statement, signed and dated by the investor, in which the investor acknowledged that the placement agent was working on the relevant fund's behalf and that the placement agent would be paid for such work.

9.      The policy referenced in the preceding paragraph was memorialized in a document titled "Investment Practices Policy" (the "Policy").

10.      Apollo Management began to implement the Policy in connection with fundraising efforts for one of its flagship private equity funds, Apollo Investment Fund VII, L.P. ("Fund VII"), which commenced in 2007.

11.      Apollo Management typically enforced the Policy by including, in its engagement agreements with placement agents, the following requirement:  if a potential investor solicited by the placement agent made an investment in a fund managed by an Apollo affiliate, the placement agent would be required to deliver to the Apollo affiliate-managed fund a disclosure form or subscription agreement executed by that investor acknowledging, among other things, that the placement agent was working for the Apollo affiliate-managed fund and that the placement agent would be paid for its work.

12.      After Apollo Management implemented the Policy, Apollo affiliate-managed funds would not pay a placement agent any fees in connection with an investor's investment in an Apollo affiliate-managed fund until the placement agent delivered to the Apollo affiliate-managed fund (or its agent, such as outside counsel) a signed investor disclosure letter from the investor.

13.      In connection with the closing process for funds managed by Apollo affiliates, the placement agent agreements between those funds and Arvco required Arvco to obtain acknowledgements from the investors for which Arvco acted as placement agent for certain investments.

- 3 -

**C.     The Fund VII Agreement**

14.     On July 1, 2007, Fund VII and its General Partner, Apollo Management VII, L.P. (together, the "Fund VII Entities") entered into a written agreement (the "Fund VII Agreement") with Arvco in which Arvco agreed to serve as a placement agent with respect to investments in Fund VII by certain investors identified in Exhibit A to the Agreement, defined as "Arvco Investors."

15.     Among the Arvco Investors identified in the Fund VII Agreement were the California Public Employees' Retirement System ("CalPERS") and the University of California.

16.     The Fund VII Agreement provided that Arvco, in exchange for its placement agent services under the Fund VII Agreement, would be paid a fee "in four equal annual installments."

17.     Arvco's fee was defined in the Fund VII Agreement as "1% of commitments for Interests received and accepted by Fund VII from ARVCO Investors," except (a) the fee "shall be payable on accepted commitments from CalPERS only to the extent that they exceed $650 million"; (b) the fee "shall be payable on accepted commitments from the Oregon State Investment Board only to the extent that they exceed $225 million"; and (c) the Fund VII Entities have "sole and absolute discretion" to determine the fee "payable on accepted commitments from New York State Common Fund, New York City, and University of California."

18.     The Fund VII Agreement required Arvco to provide the Fund VII Entities with signed investor disclosure letters from Arvco Investors who made investments in Fund VII "[p]rior to the acceptance of an ARVCO Investor's subscription" by Fund VII.

19.     The Fund VII Agreement attached a sample investor disclosure letter as Exhibit D to the Agreement.

20.     The Fund VII Agreement provided:  "In carrying out its services pursuant to this Agreement, ARVCO will duly conform to all relevant laws and regulations in all applicable jurisdictions."

21.     The Fund VII Agreement provided:  "ARVCO represents to, and agrees with, [the Fund VII Entities] as follows: . . . That it is, and at all relevant times respecting its engagement hereunder it will be, in compliance with applicable local and U.S. laws."

- 4 -

4816-2746-2004

22. The Fund VII Agreement provided: "ARVCO represents to, and agrees with, [the Fund VII Entities] as follows: . . . That it is and, at all relevant times during the term of its engagement hereunder, will continue to be, duly authorized and empowered under all applicable laws and regulations and (to the extent applicable) under its constituent documents, as to provide the services and engage in the activities contemplated by this Agreement."

23. The Fund VII Agreement provided: "ARVCO represents to, and agrees with, [the Fund VII Entities] as follows: . . . That it is aware of and is and will at all times be in compliance with the laws and regulations of all appropriate jurisdictions (including the U.S. and any applicable local or international jurisdictions) relating to currency reporting and money laundering, including, but not limited to (A) the U.S. Bank Secrecy Act and implementing regulations and (B) the USA Patriot Act of 2001 and implementing regulations."

24. The Fund VII Agreement provided: "ARVCO represents to, and agrees with, [the Fund VII Entities] as follows: . . . The performance by it of its services hereunder will be in strict compliance with all applicable laws, including, but not limited to, laws and rules promulgated under the Securities Act and 1940 Act, and the laws of any jurisdiction in which ARVCO proposes to engage in any activity hereunder, as well as [the Fund VII Entities'] instructions, policies and procedures provided in writing, from time to time, to ARVCO."

25. The Fund VII Agreement provided: "ARVCO represents to, and agrees with, [the Fund VII Entities] as follows: . . . That it is in material compliance with all applicable laws and rules respecting the activities contemplated hereunder and assumes full responsibility for complying with any registration, licensing or other relevant laws affecting ARVCO's activities as the same may be relevant to the activities contemplated hereunder. Further, without limiting the generality of the foregoing, ARVCO will not (i) engage in any marketing or (investor) solicitation activities in any jurisdiction or in any manner in which it is unlawful for ARVCO to do so or (ii) engage in any act or practice that would, directly or indirectly, contravene the U.S. Foreign Corrupt Practices Act, as amended, or any similar statute applicable in any jurisdiction in which ARVCO engages in any activity that prohibits bribery or payments to public officials, including,

- 5 -

without limitation, any policies of any government or quasi-governmental agency implementing or enforcing the foregoing."

26.    The Fund VII Agreement is governed by New York law.

**D.    The COF Agreement**

27.    On June 19, 2008, Apollo Credit Opportunity Management LLC and Apollo Credit Opportunity Fund I, L.P. ("COF," and with Apollo Credit Opportunity Management LLC, the "COF Entities") entered into an agreement (the "COF Agreement") with Arvco, whereby Arvco agreed to serve as a placement agent with respect to investments in COF by CalPERS.

28.    The COF Agreement required that, "[p]rior to the payment to ARVCO of any Fees, ARVCO shall return to [the COF Entities] the written disclosure document provided for in Section 7(b)(ii), signed and dated by CalPERS."

29.    The COF Agreement attached a sample investor disclosure letter as an Exhibit to the Agreement.

30.    The COF Agreement provided:  "In carrying out its services pursuant to this Agreement, ARVCO will comply with all relevant Laws (hereinafter defined) in all applicable jurisdictions."

31.    The COF Agreement provided:  "ARVCO represents and warrants on behalf of itself and any person or entity who is associated with ARVCO and who assists ARVCO in connection with ARVCO's engagement hereunder (each, an "Associated Person") to [the COF Entities] and covenants and agrees with [the COF Entities] that as of the Effective Date and at all times during the term of ARVCO's engagement hereunder: . . . ARVCO and each Associated Person are in compliance with all applicable rules, statutes, regulations, order, decrees or other pronouncement having the effect of Law ('Law')."

32.    The COF Agreement provided:  "ARVCO represents and warrants on behalf of itself and any person or entity who is associated with ARVCO and who assists ARVCO in connection with ARVCO's engagement hereunder (each, an "Associated Person") to [the COF Entities] and covenants and agrees with [the COF Entities] that as of the Effective Date and at all

- 6 -

times during the term of ARVCO's engagement hereunder: . . . ARVCO and each Associated Person are, and will continue for the term of its engagement hereunder, to be, duly authorized and empowered under all applicable Laws under its constituent documents, as to provided [sic] the services and engage in the activities contemplated by this Agreement."

33.     The COF Agreement provided:  "ARVCO represents and warrants on behalf of itself and any person or entity who is associated with ARVCO and who assists ARVCO in connection with ARVCO's engagement hereunder (each, an "Associated Person") to [the COF Entities] and covenants and agrees with [the COF Entities] that as of the Effective Date and at all times during the term of ARVCO's engagement hereunder: . . . ARVCO and any Associated Person have all licenses, consents, permits an[d] registrations required by Law to serve as a placement agent for the offer and sale of Interest to CalPERS, and neither this engagement nor ARVCO's performance of the services, or receipt of payments, contemplated by this Agreement will (whether or not with notice, lapse of time, or both) violate any Law, or any agreement, arrangement, relationship or understanding, applicable to or concerning ARVCO or any Associated Person."

34.     The COF Agreement provided:  "ARVCO represents and warrants on behalf of itself and any person or entity who is associated with ARVCO and who assists ARVCO in connection with ARVCO's engagement hereunder (each, an "Associated Person") to [the COF Entities] and covenants and agrees with [the COF Entities] that as of the Effective Date and at all times during the term of ARVCO's engagement hereunder: . . . ARVCO and each Associated Person are in compliance with and will comply with all applicable Law in connection with the offer of [sic] sale of Interest [sic] including, but not limited to, laws and rules promulgated under the Securities Act and the 1940 Act, and the laws of any jurisdiction in which ARVCO proposes to engage in any activity hereunder, as well as [the COF Entities'] instructions, policies and procedures providing in writing, from time to time, to ARVCO.  Further, without limiting the generality of the foregoing, ARVCO will not (A) engage in any marketing or (investor) solicitation activities in any jurisdiction or in any matter in which it is unlawful for ARVCO to do

so or (B) engage in any act or practice that would, directly or indirectly, contravene the U.S. Foreign Corrupt Practices Act, as amended, or any similar statute applicable in any jurisdiction in which ARVCO engages in any activity that prohibits bribery or payments to public to public [sic] officials, including, without limitation, any policies of any government or quasi-government agency implementing or enforcing the foregoing."

35.    The COF Agreement is governed by New York law.

**E.    Alfred Villalobos Repeatedly Bribes Buenrostro, the CEO of CalPERS**

36.    Mr. Villalobos became acquainted with Federico R. Buenrostro, Jr. ("Mr. Buenrostro") in or around 1992, while Mr. Villalobos was a member of the CalPERS Board of Administration.

37.    Mr. Buenrostro was the Chief Executive Officer of CalPERS from approximately December 1, 2002 until May 12, 2008. On May 12, 2008, Mr. Buenrostro delegated his authority to act on behalf of CalPERS and retired from CalPERS. On May 15, 2008, the CalPERS Board of Administration rescinded all authority previously delegated to Mr. Buenrostro to act on behalf of CalPERS.

38.    Beginning no later than 2005 and continuing throughout Mr. Buenrostro's tenure as CEO of CalPERS, Mr. Villalobos provided Mr. Buenrostro with numerous items of value in exchange for Mr. Buenrostro's exercise of his power as CEO for Mr. Villalobos's benefit. In or about November 2004, Mr. Villalobos hosted Mr. Buenrostro's wedding at Mr. Villalobos's home and paid for the wedding-related expenses. In or about 2005, Mr. Villalobos provided casino chips to certain members of the CalPERS Board and Mr. Buenrostro's wife. In or about 2005, Mr. Villalobos paid for Mr. Buenrostro to stay for approximately two nights at Harvey's Resort and Casino in Nevada. In or about 2006, Mr. Villalobos paid for Mr. Buenrostro to stay for approximately one night at Harrah's Lake Tahoe Resort and Casino in Nevada. In or about November 2006, Mr. Villalobos paid for Mr. Buenrostro's first-class airfare, hotel accommodations, meals, and entertainment as Mr. Villalobos accompanied Mr. Buenrostro, in his

4816-2746-2004

official capacity as CalPERS CEO, to a series of business meetings in Dubai, Macau, and Hong Kong.

39.     Beginning in or about 2007, Mr. Villalobos made several cash payments to Mr. Buenrostro.  By the end of approximately 2007, Mr. Villalobos had made cash payments to Mr. Buenrostro totaling approximately $200,000, all of which was delivered directly to Mr. Buenrostro at the Hyatt Hotel in Sacramento, California.  Mr. Villalobos delivered to Mr. Buenrostro the first two installments of the $200,000 payments, of approximately $50,000 each, in paper bags.  Mr. Villalobos, when delivering to Mr. Buenrostro the first $50,000 payment, advised Mr. Buenrostro to refrain from depositing the funds in any increments greater than $10,000 to avoid the creation of a report by the depositing bank.  Mr. Villalobos delivered to Mr. Buenrostro the final installment of the $200,000 payments, of approximately $100,000, in a shoebox.  Mr. Villalobos, when he delivered the shoebox containing approximately $100,000 to Mr. Buenrostro, advised Mr. Buenrostro to "shuffle" the currency before making any deposits, since the bills were new and appeared to be in sequential order, such that the deposit of a large number of sequential bills would likely generate a report by the depositing bank.

**F.     Investments in Fund VII and COF**

40.     On August 17, 2007, CalPERS executed a Subscription Agreement in which it committed to invest $1,000,000,000 in Fund VII.  On August 30, 2007, CalPERS memorialized its investment in Fund VII in a letter executed by CalPERS and Fund VII and Apollo Advisors VII, L.P.

41.     On August 30, 2007, the New York State Common Retirement Fund made a commitment of $350,000,000 to Fund VII.   On September 12, 2007, the Oregon Public Employees Retirement Fund ("OPERF") made a commitment of $400,000,000 to Fund VII.  On September 12, 2007, the Oregon Common School Fund ("OCSF") made a commitment of $25,000,000 to Fund VII.  On October 12, 2007, the University of California made a commitment of $25,000,000 to Fund VII.  On February 5, 2008, the New York City Retirement Systems made

- 9 -

a commitment of $225,000,000 to Fund VII. On April 15, 2008, CalPERS committed to invest $1,000,000,000 in COF.

42.    Pursuant to the COF Agreement, COF agreed to pay Arvco (if it complied with all terms of the COF Agreement) a total fee of $9,250,000, in three installments, in connection with CalPERS's investment in COF.

**G.    CalPERS and the University of California Refuse to Sign Investor Disclosure Letters**

43.    On August 23, 2007, Carrissa Villalobos ("Ms. Villalobos"), the then-General Counsel of Arvco and Alfred Villalobos's daughter, e-mailed Joncarlo Mark ("Mr. Mark"), a member of CalPERS's investment staff, a copy of the investor disclosure letter for Fund VII and requested that he execute the document prior to the closing of Fund VII, which was scheduled for the following day, August 24, 2007. On August 23, 2007, Mr. Mark informed Ms. Villalobos via e-mail that he had been advised by the CalPERS legal department not to sign the investor disclosure letter. Shortly after receiving the August 23, 2007 email from Mr. Mark, Ms. Villalobos informed Mr. Villalobos that CalPERS had refused to sign the Fund VII investor disclosure letter.

44.    Mr. Villalobos knew and understood that neither Apollo nor Apollo affiliate-managed funds would pay Arvco in connection with investments it had procured until the relevant Apollo affiliate-managed funds received signed disclosure letters from investors in the funds.

45.    The University of California also refused to sign an investor disclosure letter with respect to its Fund VII investment. Mr. Villalobos understood and acknowledged to Apollo that Arvco would not be receiving a fee from Apollo or an Apollo affiliate-managed fund for the University of California's investment in Fund VII because the University of California had refused to sign the investor disclosure letter. Neither Apollo nor any Apollo affiliate-managed fund has ever paid any fees to Arvco or Mr. Villalobos in connection with the University of California's investment in Fund VII.

4816-2746-2004

**H.    The Fraudulent Investor Disclosure Letters**

46.    On January 2, 2008, Mr. Villalobos spoke on the telephone for 17 minutes with Stephanie Drescher ("Ms. Drescher"), Global Head of Business Development and Investor Relationship Management at AGM.  (Laufer Decl. Ex. 24.)  During the call, Mr. Villalobos told Ms. Drescher that "he was due to see CalPERS" soon and intimated that a CalPERS representative would be executing investor disclosure letters at that meeting.

47.    Mr. Villalobos met with Mr. Buenrostro in January 2008, presented Mr. Buenrostro with a series of documents, and requested that Mr. Buenrostro execute them on behalf of CalPERS.  Mr. Villalobos told Mr. Buenrostro that Mr. Villalobos needed to provide Apollo with forms signed by a CalPERS representative in order to satisfy Apollo's record-keeping obligations and to ensure that Arvco would receive commission fees from Apollo.  Before Mr. Buenrostro signed the documents, Mr. Villalobos told Mr. Buenrostro that a senior member of the CalPERS investment staff had declined to sign the investor disclosure letter for Fund VII.  Mr. Villalobos instructed Mr. Buenrostro to date some of the documents and to leave others undated.

48.    When Mr. Buenrostro signed the documents, he did so not for the benefit of CalPERS or the citizens of California, but rather to further his corrupt relationship with Mr. Villalobos.  Mr. Buenrostro did no due diligence before signing the documents and did not confer with other CalPERS staff members before signing the documents.  After signing the documents, Mr. Buenrostro promised Mr. Villalobos that he would not advise anyone within CalPERS of his meeting with Mr. Villalobos or his having signed the documents.  At no time did Mr. Buenrostro give the documents he had signed to any person or entity within CalPERS.  Some or all of the documents that Mr. Buenrostro signed were blank, other than a date field and a signature block.

49.    Ms. Villalobos created templates of investor disclosure letters based on the language included as Exhibit D to the Fund VII Agreement, and "customized each [letter] to be specific to that investor."  Ms. Villalobos saved these templates on the Arvco computer server. The Arvco computer server contained, among other things, an electronic document with the filename "ApolloCalPERS Investor Disclosure," which was blank, other than a blue CalPERS logo in the upper right-hand corner, the title "Investor Disclosure," a date field, and a signature

4816-2746-2004

block that identified, in typeface, Mr. Buenrostro as the signatory on behalf of CalPERS.  The document was created on or around April 4, 2008.  In addition, the Arvco computer server contained an electronic document with the filename "Investor Disclosure CalPERS Apollo ACOF.doc," which contained the body text of a purported disclosure by CalPERS with respect to COF, but no letterhead, date, signature block, signature, or CalPERS logo.  This document was created on or around June 19, 2008 and was last saved by "dfox."  The Arvco computer server also contained a digital image of a blue CalPERS logo.

50.    On a specific occasion in 2008, Mr. Villalobos asked Cynthia Faust ("Ms. Faust"), Arvco's controller during the relevant period, to retrieve a document containing the body text of a disclosure letter, but without the CalPERS logo, from Arvco's computer server.  After calling Ms. Villalobos to identify where the document was saved, Ms. Faust printed a copy of the body text and gave it to Mr. Villalobos.  Later on the same day, Ms. Faust witnessed Mr. Villalobos remove from a set of files in his office a piece of paper that was blank, other than a date field, a signature block, and an ink signature at the bottom that Ms. Faust believed to belong to Mr. Buenrostro.  As Mr. Villalobos removed the piece of paper from his files, Ms. Faust heard him make a comment along the lines of "Oh, we've got another one" or "Oh, good, I have one more."  Mr. Villalobos then handed the piece of paper that was blank (other than the date field, the signature block, and Mr. Buenrostro's signature) to Dustin Fox ("Mr. Fox"), another Arvco employee, who went back to his own office.  Ms. Faust believed at the time that Mr. Fox was supposed to reproduce the body text of the investor disclosure letter that Ms. Faust had printed on the blank piece of paper bearing Mr. Buenrostro's signature.

51.    Arvco subsequently sent Apollo and/or Apollo's lawyers purported investor disclosure letters bearing Mr. Buenrostro's signature with respect to CalPERS's investments in several Apollo affiliate-managed funds:  Fund VII, COF, Apollo Investment Europe, Special Opportunity Managed Account, and the Apollo European Principal Finance Loan Fund.

4816-2746-2004

**I.    Apollo Pays Arvco $3,525,000 in Fees in Reliance on the Fraudulent Disclosure Letter for Fund VII**

52.     By no later than January 7, 2008, Apollo's outside counsel received from Arvco a document purporting to be an investor disclosure letter signed by Mr. Buenrostro and dated November 20, 2007 in connection with CalPERS's investment in Fund VII.  On or around August 27, 2008, Apollo Management received an invoice from Arvco for placement agent fees with respect to Fund VII.  Apollo initiated the first payment to Arvco in connection with Fund VII, in the amount of $1,375,000, on or about October 2, 2008; the amount was paid through AIF VII Euro Holdings, LP to Arvco's bank account at Colonial Bank.  Apollo initiated the second payment to Arvco in connection with Fund VII, in the amount of $387,500, on or about December 23, 2008; again, the amount was paid through AIF VII Euro Holdings, LP to Arvco's bank account at Colonial Bank.

53.     On or around October 1, 2009, Apollo Management received another invoice from Arvco for placement agent fees with respect to Fund VII.  Apollo initiated the third payment to Arvco in connection with Fund VII, in the amount of $1,375,000, on or about October 30, 2009; again, the amount was paid through AIF VII Euro Holdings, LP to Arvco's bank account at Colonial Bank.

54.     On or around November 1, 2009, Apollo Management received another invoice from Arvco for placement agent fees with respect to Fund VII.  Apollo initiated the fourth and final payment to Arvco in connection with Fund VII, in the amount of $387,500, on or about November 16, 2009; again, the amount was paid through AIF VII Euro Holdings, LP to Arvco's bank account at Colonial Bank.

55.     Apollo and related entities would not have paid any amounts to Arvco in connection with CalPERS's investment in Fund VII if Arvco had not delivered the purported investor disclosure letter signed by Mr. Buenrostro.

4816-2746-2004

**J.    Apollo Pays Arvco $7,570,833 in Fees in Reliance on the Fraudulent Disclosure Letter for COF**

56.    On or around May 9, 2008, Apollo Management received an invoice from Arvco for placement agent fees with respect to COF.  On or about June 20, 2008, an Apollo in-house attorney received from Arvco a document purporting to be an investor disclosure letter signed by Mr. Buenrostro and dated May 20, 2008 in connection with CalPERS's investment in COF.  Mr. Buenrostro had officially delegated his authority as CEO of CalPERS as of May 12, 2008, and CalPERS had officially rescinded Mr. Buenrostro's authority as CEO as of May 15, 2008. Apollo initiated the first payment to Arvco in connection with COF, in the amount of $4,166,667, on or about June 27, 2008; the amount was paid from COF to Arvco's bank account at Colonial Bank.

57.    On or around January 26, 2009, Apollo Management received another invoice from Arvco for placement agent fees with respect to COF.  Apollo initiated the second and final payment to Arvco in connection with COF, in the amount of $3,404,166, on or about January 27, 2009; the amount was paid through Apollo Management's account to Arvco's bank account at Colonial Bank.  This amount was part of a larger payment of $4,294,791 to Arvco that concerned both COF and a separate Apollo-managed fund; the $3,404,166 portion paid for COF reflected a 5% discount in Arvco's fees from the full $3,583,333 amount due in June 2009, and Arvco agreed to accept the reduced payment in exchange for receiving payment 5 months early.

58.    Apollo and related entities would not have paid any amounts to Arvco in connection with CalPERS's investment in COF if Arvco had not delivered the purported investor disclosure letter signed by Mr. Buenrostro.

**K.    Mr. Villalobos and Mr. Buenrostro Lie under Oath about Their Misconduct**

59.    On March 18, 2010, Mr. Buenrostro appeared for sworn testimony before the SEC.  He declined to respond substantively to the SEC's questions and instead asserted his Fifth Amendment right against self-incrimination.  On December 27, 2010, Mr. Buenrostro provided sworn testimony to the California Attorney General's office.  While under oath, Mr. Buenrostro

4816-2746-2004

testified falsely regarding his role in and knowledge of the creation, execution, and transmittal of the fraudulent investor disclosure letters.

60.     Between March 18, 2010 and December 27, 2010, Mr. Buenrostro and Mr. Villalobos met on multiple occasions, and during these meetings Mr. Villalobos provided Mr. Buenrostro with false statements and representations for Mr. Buenrostro to recite when questioned under oath.  After Mr. Buenrostro provided false testimony to the California Attorney General's office on December 27, 2010, Mr. Villalobos reviewed the transcript of Mr. Buenrostro's testimony and advised Mr. Buenrostro that he had responded as he and Mr. Villalobos had agreed and rehearsed.

61.     On or about November 28, 2011, Mr. Villalobos executed a written response to a "Wells" notice from the SEC, in which Mr. Villalobos (a) adopted the false statements Mr. Buenrostro had given during his December 27, 2010 deposition, and (b) falsely represented and concealed his role in the creation, execution, and transmittal of the fraudulent investor disclosure letters.  Mr. Villalobos subsequently provided false testimony under oath.

62.     Mr. Villalobos also committed fraudulent acts in connection with his and Arvco's bankruptcy proceedings by failing to disclose the full extent of his assets in order to keep them out of the bankruptcy estate.  In connection with his required financial disclosures, Mr. Villalobos failed to disclose his ownership of several items of jewelry valued at approximately $496,500.

**L.     The Government Investigations and Proceedings**

63.     On or about November 30, 2009, the law firm Steptoe & Johnson LLP, as counsel for CalPERS, commenced a special review "to determine whether the interests of [CalPERS] participants and beneficiaries may have been compromised by the payment of placement agent fees and related activities" (the "CalPERS Special Review").

64.     On May 5, 2010, the California Attorney General's Office filed a civil complaint against Mr. Villalobos, Arvco, and Mr. Buenrostro, alleging violations of Cal. Corp. Code §§ 25210, 25216(a), and 25403 and Bus. & Prof. Code § 17200 (the "Cal AG Action").  On or about February 19, 2016, Mr. Buenrostro entered into a consent agreement with the California Attorney

4816-2746-2004

General's Office to resolve the Cal AG Action, pursuant to which Mr. Buenrostro consented to a monetary judgment against him in the amount of $250,000. On February 29, 2016, Arvco entered into a consent agreement with the California Attorney General's Office whereby it agreed to pay a $20 million civil penalty to resolve the Cal AG Action.

65.    On April 23, 2012, the SEC filed a complaint against Arvco, Arvco Financial Ventures, LLC, Villalobos, and Mr. Buenrostro, alleging violations of Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa (the "SEC Action"). On April 1, 2015, Mr. Buenrostro entered into a consent agreement with the SEC to resolve the SEC Action.

66.    On March 14, 2013, the United States Department of Justice ("DOJ") indicted Mr. Villalobos and Mr. Buenrostro for violations of 18 U.S.C. § 371, 18 U.S.C. § 1001(a)(1), 18 U.S.C. § 1349, 18 U.S.C. § 1001(a)(2), 18 U.S.C. § 1505, 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c) (the "DOJ Action"). On July 11, 2014 the DOJ filed a superseding information against Mr. Buenrostro for a violation of 18 U.S.C. § 371. On July 11, 2014, Mr. Buenrostro pleaded guilty in the DOJ Action to conspiracy to commit bribery and honest services fraud, in violation of 18 U.S.C. § 371. On August 8, 2014, the district court scheduled Mr. Villalobos's criminal trial in the DOJ Action to commence on February 23, 2015. On January 13, 2015, Mr. Villalobos committed suicide.

## CONCLUSIONS OF LAW

1.    Summary judgment is appropriate if the record before the court demonstrates that no material issue of fact is in dispute and that the moving party is entitled to judgment as a matter of law. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322-23 (1986). The burden

then shifts to the non-moving party to present evidence that there is a genuine issue for trial. *Id.* at 324. While all reasonable inferences must be drawn in favor of the non-moving party, the non-moving party must produce sufficient evidence to reasonably support a jury verdict in its favor, *Anderson*, 477 U.S. at 248, and not just "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-moving] plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also In re Agric. Research and Tech. Grp., Inc.*, 916 F.2d 528, 533 (9th Cir. 1990).

2.      Under New York law, "[t]he essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." *Inv. Retrievers, Inc.* v. *Fox*, 52 N.Y.S.3d 662, 662-63 (N.Y. App. Div. 2017).

3.      Under New York law "a party will be denied recovery even on a contract valid on its face, [(i)] if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance," and (ii) if there is "a direct connection between the illegal transaction and the obligation sued upon." *McConnell* v. *Commonwealth Pictures Corp.*, 166 N.E.2d 494, 497 (N.Y. 1960). This proposition is premised on the "long-settled public policy" that New York law "closes the doors of [its] courts to those who sue to collect the rewards of corruption." *Id.* at 496. "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Id.* (quoting *Riggs* v. *Palmer*, 22 N.E. 188, 190 (1889)).

4.      Engaging in "commercial bribery or similar conduct," including fraud, constitutes the type of "gravely immoral and illegal conduct" that excuses a contracting party's performance. *Id.*; *see also Spivak* v. *Sachs*, 211 N.E.2d 329, 331 (N.Y. 1965) (dismissing California attorney's claim for unpaid legal fees where fees were based on legal services provided in New York and

attorney was not registered to practice law in New York, rendering provision of services illegal);

*B.D. Estate Planning Corp.* v. *Trachtenberg*, 22 N.Y.S.3d 202, 202-03 (N.Y. App. Div. 2015)

(affirming trial court ruling permitting defendant to plead "'bribery and corruption' and recovery

of fruits of crimes barred" as affirmative defenses where plaintiff was convicted of mail and wire

fraud); *Goldberger* v. *Magid*, 19 N.Y.S.3d 416, 416 (N.Y. App. Div. 2015) (denying plaintiff's

motion for summary judgment where defendant raised genuine issue of fact as to whether

promissory note upon which plaintiff was suing was "a sham transaction" and whether "part of

the amount which plaintiff seeks is the fruit of a crime") (internal quotation marks omitted); *CPN

Mech. Inc.* v. *Madison Park Owner, LLC*, 992 N.Y.S.2d 880, 880-81 (N.Y. App. Div. 2014)

(affirming dismissal of breach of contract claim where plaintiff engaged in illegal overbilling

scheme directly connected to its performance under contract); *G Builders IV LLC* v. *Madison

Park Owner, LLC*, 955 N.Y.S.2d 28, 29 (N.Y. App. Div. 2012) (affirming dismissal of claim to

enforce mechanic's lien where plaintiff engaged in illegal kickback and overbilling scheme in

connection with relevant construction project); *Alpha Interiors, Inc.* v. *Tulgar Constr. Corp.*, 956

N.Y.S.2d 67, 68-69 (N.Y. App. Div. 2012) (reversing denial of defendant's motion for summary

judgment where plaintiff violated New York law, and vitiated its right to recovery under contract,

by requiring its employees to participate in kickback scheme); *FCI Grp., Inc.* v. *City of New York*,

862 N.Y.S.2d 352, 353-54, 357-58 (N.Y. App. Div. 2008) (reversing denial of summary

judgment and dismissing plaintiff's breach of contract claim where defendant canceled contract

and stopped making payments to plaintiff after plaintiff attempted to bribe city officials); *R.A.C.

Grp., Inc.* v. *Bd. of Educ. of City of New York*, 799 N.Y.S.2d 559, 564 (N.Y. App. Div. 2005)

(reversing trial decision for plaintiffs and dismissing claim where plaintiffs fraudulently brokered

leasing arrangement between private property owner and city, on ground that "plaintiffs should

not be allowed to benefit from such conduct"); *Prote Contracting Co., Inc.* v. *Bd. of Educ. of City

of New York*, 657 N.Y.S.2d 158, 164 (N.Y. App. Div. 1997) (reversing trial decision for plaintiff

based on new evidence that plaintiff bribed city official in the course of performing contract, and

noting that, "[w]ithout doubt, the conduct alleged on the part of plaintiff in offering a bribe to a

- 18 -

4816-2746-2004

key Board of Education employee as to a determination bearing on the issue of performance, if established, would be of a kind so gravely illegal and immoral and so inextricably connected with the contested question of performance under the contracts as to bar recovery thereunder as a matter of public policy"); *Braunstein* v. *Jason Tarantella, Inc.*, 450 N.Y.S.2d 862, 865-66 (N.Y. App. Div. 1982) (dismissing claim for accounting of proceeds related to contract for distribution of film where parties violated New York obscenity laws by producing film in question); *Villacorta* v. *Saks Inc.*, No. 100168/2007, 2011 WL 2535058, at *9-10 (N.Y. Sup. Ct. May 6, 2011) (dismissing breach of contract claim seeking additional compensation where basis for additional compensation was product of plaintiff's "falsifying of business records"); *Frohlich & Newell Foods, Inc.* v. *New Sans Souci Nursing Home*, 441 N.Y.S.2d 335, 337-38 (N.Y. Civ. Ct. 1981) (denying plaintiff's claim for recovery under contract where plaintiff engaged in false billing and kickback scheme in connection with contract); *cf. S.T. Grand, Inc.* v. *City of New York*, 298 N.E.2d 105, 108-09 (N.Y. 1973) (affirming grant of summary judgment deeming contract illegal and denying plaintiff's claim to recover unpaid fees after plaintiff was convicted of conspiracy to violate state bribery laws in connection with procurement of contract).

5.    New York courts have consistently interpreted the "direct connection" requirement to mean that the illegal conduct is "central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract." *Ross Bicycles, Inc.* v. *Citibank, N.A.*, 577 N.Y.S.2d 826, 828 (N.Y. App. Div. 1991) (quoting *McConnell*, 166 N.E.2d at 494).

6.    There is no genuine issue of material fact that Arvco and Mr. Villalobos engaged in "gravely immoral and illegal conduct" in their course of performance under the Fund VII and COF Agreements, and that this illegal conduct bore a "direct connection" to the "obligation sued upon" by the Trustee. Arvco and Mr. Villalobos engaged in a multi-year fraudulent scheme with Mr. Buenrostro, whereby Mr. Villalobos bribed Mr. Buenrostro in exchange for, among other things, Mr. Buenrostro's signature on forged investor disclosure letters. Mr. Buenrostro's signature of the forged investor disclosure letters permitted Arvco and Mr. Villalobos to receive commission fees from Apollo to which they would not otherwise have been entitled. This illegal

4816-2746-2004

conduct was central to and was a dominant part of Arvco and Mr. Villalobos's entire course of conduct under the contracts.

7.    Based on the Court's findings that Mr. Villalobos and Arvco engaged in illegal conduct with respect to the investments made by CalPERS (and the commission fees that resulted from those investments), the Trustee is also not entitled to recover any unpaid fees that resulted from investments made by other entities which Mr. Villalobos and Arvco solicited.  The illegal conduct as to the CalPERS investments was central to and a dominant part of Arvco and Mr. Villalobos's entire course of performance of the contracts—which performance encompassed both soliciting investors and marketing Apollo's funds—and New York courts have consistently denied all recovery to contracting parties who engage in egregious illegal conduct, as here.  New York courts do not parse contracts to allow recovery of amounts purportedly earned independently of illegal conduct.  Instead, courts categorically deny all recovery to ensure that the important public policy embodied in *McConnell* is not "weakened by exceptions."  *See, e.g.*, *CPN Mech., Inc.* v. *Madison Park Owner, LLC*, 992 N.Y.S.2d 880 (N.Y. App. Div. 2014) (denying plaintiff all recovery despite the fact that its illegal act of stealing $100,000 from defendant involved only 1.25% of total contract price); *FCI Group, Inc.* v. *City of New York*, 54 A.D.3d 171 (N.Y. App. Div. 2008) (confirming that illegal conduct bars all recovery, even if the illegality supposedly affected only a portion of the amount at issue); *Prote Contracting Co., Inc.* v. *Bd. of Educ. of City of New York*, 657 N.Y.S.2d 158 (N.Y. App. Div. 1997) (remanding for determination of whether the alleged bribery, which affected only one aspect of the contracts in question, had in fact occurred and noting that if it had the plaintiff would be barred from all recovery).  Indeed, illegal conduct that satisfies the requirements of *McConnell* "so taint[s] the entire endeavor as to render hollow assertions of good behavior in other and secondary aspects." *Colyvas* v. *Red Hand Compositions Co.*, 318 F. Supp. 1376, 1378 (S.D.N.Y. 1970).

8.    The Trustee is not entitled to recover any fees allegedly owed to her under the Fund VII Agreement or the COF Agreement.

/ /

- 20 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter came on regularly for hearing May 10, 2018 and August 2, 2018, before Gregg W. Zive, U.S. Bankruptcy Judge, upon Defendants' Motion for Summary Judgment (ECF No. 157).

Appearing on behalf of the Trustee was Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, by Marc E. Rohatiner, Esq. and appearing on behalf of Defendants was Paul, Weiss, Rifkind, Wharton & Garrison LLP, by Andrew J. Ehrlich, Esq.

Pursuant to its findings of fact and conclusions of law entered orally on the record in open court pursuant to Fed. R. Bankr. P. 9014, 7052 and Fed. R. Civ. P. 52(a), which are hereby incorporated by reference, and its written Findings of Fact and Conclusions of Law entered concurrently with this Order, and good cause appearing;

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 157) is GRANTED as to Counts 1 and 2 of the Second Amended Complaint. Judgment on Counts 1 and 2 of the Second Amended Complaint (ECF No. 106) shall be entered in favor of Defendants; Plaintiff shall recover nothing from Defendants; and the Second Amended Complaint (ECF No. 106) is hereby adjudicated in its entirety with Plaintiff being entitled to recover nothing thereunder.

4816-2746-2004

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

\_\_\_ The court has waived the requirement set forth in LR 9021(b)(1).

\_\_\_ No party appeared at the hearing or filed an objection to the motion.

 X  I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

~~Approved / Disapproved/~~ **Failed to Respond**

WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP

By: _____
     Marc E. Rohatiner, Esq.
     11400 W. Olympic Blvd., Ninth Floor
     Los Angeles, CA 90064

\_\_\_ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

Respectfully Submitted By:

SNELL & WILMER, L.L.P.

/s/Nathan G. Kanute_____
William E. Peterson (Nevada Bar No. 1528)
Nathan G. Kanute, Esq. (Nevada Bar No. 12413)
SNELL & WILMER L.L.P.
50 W. Liberty St., Suite 510
Reno, NV 89501
*Attorneys for Defendants*

- 22 -

4816-2746-2004